CITY OF WEST HAVEN *v.* BERTHA NORBACK ET AL.
(SC 16777)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 12, 2002—officially released April 22, 2003

*Mark A. Milano,* with whom, on the brief, was *Naureen R. Weissman,* for the appellant (plaintiff).

*John M. Gesmonde,* for the appellee (named defendant).

*Opinion*

VERTEFEUILLE, J. The plaintiff, the city of West Haven, appeals from the judgment of the trial court, rendered in accordance with the report of a judge trial referee (referee), awarding the named defendant,[1] Bertha Norback, additional compensation for the taking of her real property by eminent domain. The plaintiff first contends that the trial court improperly accepted the referee's report without conducting a plenary review of the referee's findings pursuant to provisions of the

---

[1] The other defendants in this case are the South Central Connecticut Regional Water Authority, a lienholder for water use charges, and the tax collector of the city of West Haven, the holder of tax liens. The interests of these defendants are not at issue in this appeal and we therefore refer to Norback as the defendant.

General Statutes. The plaintiff also raises eight separate claims of impropriety with regard to the proceedings conducted by the referee and the referee's findings. We affirm the judgment of the trial court.

The following undisputed facts and procedural history guide our resolution of this appeal. The plaintiff, through its redevelopment agency, adopted a redevelopment plan encompassing several properties located along Saw Mill Road in West Haven. Pursuant to that redevelopment plan and as authorized by General Statutes § 8-124,[2] the plaintiff took approximately eighty-four acres of land through its power of eminent domain. Included among these parcels of land was the defendant's property, which was approximately 3.6 acres in size. The plaintiff determined the value of the defendant's property taken to be $300,000, as evidenced by the statement of compensation filed by the plaintiff on September 23, 1998. Contending that she was aggrieved by the plaintiff's valuation of her property, in January of 1999, the defendant applied for review of the amount of compensation pursuant to General Statutes (Rev. to 1999) § 8-132.[3] The review was then referred to the

[2] General Statutes § 8-124 provides in relevant part: "It is found and declared that there have existed and will continue to exist in the future . . . substandard, insanitary, deteriorated, deteriorating, slum or blighted areas which constitute a serious, and growing menace, injurious and inimical to the public health, safety, morals and welfare of the residents of the state . . . that the acquisition of property . . . [and] the removal of structures and improvement of sites, the disposition of the property for redevelopment incidental to the foregoing, the exercise of powers by municipalities acting through agencies known as redevelopment agencies as herein provided, and any assistance which may be given by any public body in connection therewith, are public uses and purposes for which public money may be expended and the power of eminent domain exercised; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination."

[3] General Statutes (Rev. to 1999) § 8-132 provides in relevant part: "Any person claiming to be aggrieved by the statement of compensation filed by the redevelopment agency may, at any time within six months after the same has been filed, apply to the superior court for the judicial district in which such property is situated . . . for a review of such statement of

referee, who, after a hearing, rendered a report revising the valuation of the defendant's property to $894,000.[4] After the trial court rendered judgment in accordance with the referee's report, the plaintiff appealed to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

On appeal, the plaintiff challenges the trial court's acceptance of the referee's report and the judgment rendered in conformity with the report without a plenary review of the referee's findings. In addition, the plaintiff challenges eight aspects of the proceedings and report. The plaintiff contends that: (1) the referee improperly considered the anticipated development of the area surrounding the defendant's property in determining the fair market value of the property; (2) the referee improperly allowed expert testimony as to the value of the property; (3) the referee failed to deduct from his valuation the high development costs associated with the parcel's unusual topography; (4) the referee reached inconsistent conclusions in determining the highest and best use of the property; (5) the referee improperly used a "per acre" valuation method when

compensation so far as the same affects such applicant, and said court . . . shall appoint a state referee to make a review of the statement of compensation. Such referee . . . shall hear the applicant and said redevelopment agency, shall view the property and take such testimony as such referee deems material and shall thereupon revise such statement of compensation in such manner as he deems proper and forthwith report to the court. . . . Such report may be rejected for any irregular or improper conduct in the performance of the duties of such referee. If the report is rejected, the court or judge shall appoint another referee to make such review and report. If the report is accepted, such statement of compensation shall be conclusive upon such owner and the redevelopment agency. . . ."

Subsequent to 1999, § 8-132 has been amended several times. See, e.g., Public Acts 2000, No. 00-89. Those changes are not relevant to this appeal. References herein to § 8-132 are to the 1999 revision.

[4] The referee arrived at this figure by valuing the property at $300,000 per acre ($1,083,000 for 3.61 acres), then subtracting the value of "sand and gravel remaining" on the property ($189,000).

determining the fair market value of the property; (6) the referee improperly failed to deduct the costs of demolishing the various improvements on the property from the fair market value of the property; (7) the referee improperly determined that the parcel's highest and best use for retail purposes could also include use as office space; and (8) the referee's conclusion that the plaintiff substantially undervalued the property was not supported by the subordinate facts presented. We conclude that there is no merit to any of the plaintiff's claims.

I

As a threshold matter, the plaintiff contends that the trial court improperly declined to conduct a plenary review of the findings in the referee's report for mistakes of law and erroneous conclusions based on facts found. Specifically, the plaintiff claims that the provision in § 8-132[5] governing the rejection of a referee's report for "irregular or improper conduct in the performance of the duties of [the] referee" should be read to authorize plenary review of the referee's findings in the Superior Court. The defendant asserts, in response, that § 8-132 must be read in the context of Connecticut constitutional and legislative provisions that provide judge trial referees with the same authority as that exercised by Superior Court judges. One such provision is General Statutes § 52-434a.[6] The defendant further asserts that,

[5] See footnote 3 of this opinion.

[6] General Statutes § 52-434a provides in relevant part: "(a) In addition to the powers and jurisdiction granted to state referees under the provisions of section 52-434, a Chief Justice or judge of the Supreme Court, a judge of the Appellate Court, a judge of the Superior Court or a judge of the Court of Common Pleas, who has ceased to hold office as justice or judge because of having retired and who has become a state referee and has been designated as a trial referee by the Chief Justice of the Supreme Court shall have and may exercise, with respect to any civil matter referred by the Chief Court Administrator, the same powers and jurisdiction as does a judge of the court from which the proceedings were referred. . . .

"(c) The power conferred by this section may be exercised by any such state referee, whether acting in his capacity as a state referee, or as an

pursuant to § 52-434a, a judge trial referee appointed pursuant to § 8-132 may render judgment on his or her findings without first presenting the report to a Superior Court judge and that the plaintiff's sole recourse for addressing its various objections to the report is through an appeal to the Appellate Court. We agree with the defendant.

The following additional facts provide the background necessary to understanding the plaintiff's claim. After the referee submitted his report to the trial court,[7] the plaintiff promptly filed an objection to the acceptance of the report.[8] The trial court requested briefing from both parties on whether § 8-132 allowed for plenary review of the plaintiff's objections by the trial court or limited such a review to the Appellate Court. After a hearing, the trial court construed the provisions of § 8-132 as limiting its review of the report to "gross irregularit[ies]," such as the referee taking a site visit without the presence of counsel. The trial court rejected the plaintiff's claim that the court should review the referee's conclusions based on findings the referee made and his conclusions of law. The court then determined that there was no irregular or improper conduct on the part of the referee, and the referee's report and

auditor, or as a committee of one, or by any committee composed of not more than three such state referees, with respect to any civil matter referred to him or to it, the provisions of any general or special law to the contrary notwithstanding."

[7] Upon filing of the referee's report, the clerk had stamped the report with a notation that judgment had been entered. The trial court later vacated this judgment as having been entered improperly.

[8] The plaintiff filed an objection to the acceptance of the referee's report pursuant to Practice Book § 19-14 and the provisions of § 8-132. Practice Book § 19-14 provides in relevant part: "A party may file objections to the acceptance of a report on the ground that conclusions of fact stated in it were not properly reached on the basis of the subordinate facts found, or that the committee or attorney trial referee erred in rulings on evidence or other rulings or that there are other reasons why the report should not be accepted. . . ."

revised statement of compensation were accepted by the court, which then rendered judgment for the plaintiff for the $594,000 balance due on the compensation awarded.[9]

Resolution of this issue requires us to determine whether § 52-434a effectively supersedes the procedural provisions of § 8-132. In matters requiring interpretation of statutes our review is plenary. *State* v. *Valedon*, 261 Conn. 381, 385–86, 802 A.2d 836 (2002); *Connor* v. *Statewide Grievance Committee*, 260 Conn. 435, 438–39, 797 A.2d 1081 (2002).

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Thus, this process requires us to consider all relevant sources of the meaning of the language at issue, without having to cross any threshold or thresholds of ambiguity. Thus, we do not follow the plain meaning rule.

"In performing this task, we begin with a searching examination of the language of the statute, because that is the most important factor to be considered. In doing

---

[9] The referee had valued the property at $894,000. See footnote 4 of this opinion and the accompanying text. Pursuant to § 8-132, the plaintiff previously had remitted $300,000 to the defendant as a result of its initial valuation of the property. Accordingly, the judgment of the trial court directed the plaintiff to pay the $594,000 balance to the defendant.

so, we attempt to determine its range of plausible meanings and, if possible, narrow that range to those that appear most plausible. We do not, however, end with the language. We recognize, further, that the purpose or purposes of the legislation, and the context of the language, broadly understood, are directly relevant to the meaning of the language of the statute.

"This does not mean, however, that we will not, in a given case, follow what may be regarded as the plain meaning of the language, namely, the meaning that, when the language is considered without reference to any extratextual sources of its meaning, appears to be *the* meaning and that appears to preclude any other likely meaning. In such a case, the more strongly the bare text supports such a meaning, the more persuasive the extratextual sources of meaning will have to be in order to yield a different meaning." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003).

We begin with the Connecticut constitution, as adopted in 1965, which provides that "a judge of the superior court . . . who has attained the age of seventy years and has become a state referee may exercise, as shall be prescribed by law, the powers of the superior court . . . on matters referred to him [or her] as a state referee." Conn. Const., art. V, § 6. This change in the scope of the authority of judge trial referees was significant. Prominent judge trial referees, including the former governor and United States Senator, Raymond E. Baldwin, and former Connecticut Supreme Court Chief Justice Patrick B. O'Sullivan and Associate Justice Abraham S. Bordon, were actively involved as delegates to the 1965 Connecticut constitutional convention and advocated for expansion of the powers of judge trial referees.[10]

---

[10] Former Associate Justice Bordon, then a judge trial referee, stated the following during the Connecticut constitutional convention. "At the present

Section 52-434a,[11] which was enacted by the legislature in 1967, two years after adoption of the Connecticut constitution, codifies the powers delegated to judge trial referees with regard to civil actions. Section 52-434a (c) provides that "[t]he power conferred by this section may be exercised by any such state referee, whether acting in his capacity as a state referee, or as an auditor, or as a committee of one, or by any committee composed of not more than three such state referees, with respect to any civil matter referred to him or to it, *the provisions of any general or special law to the contrary notwithstanding.*" (Emphasis added.) The plain language of § 52-434a (c) therefore supports the defendant's contention that judge trial referees may exercise the full powers of Superior Court judges in all civil matters referred to them, including proceedings pursuant to § 8-132, despite any conflicting statutory provisions.

time, a retired judge becomes a State Referee. A State Referee has jurisdiction over cases referred to him by the Superior Court or by the Court of Common Pleas. A State Referee has no right or power to enter a judgment after he decides the case; he may only make a recommendation to the Superior or the Common Pleas Court, which recommendation may or may not be adopted, and from there it may be appealed to the Supreme Court. I have had a feeling that there has been a lot of waste in the energies of the State Referees in that they have no power to enter any orders which may come during the trial of a case before a State Referee. . . . I feel that a judge should be retired at the age of seventy, but should remain a judge rather than a referee so that if a matter is referred to him, he then sits as a judge, rather than as a referee. He may himself enter a judgment, and from that judgment the matter may be appealed to the Supreme Court. . . . I think that some amendment or some provision in the Constitution which makes a judge a judge for the rest of his life once he reaches the age of seventy and makes him available for whatever duties the judges of the Superior or Supreme Court may think he's able to perform. I think it would help the load, the congestion, in the Superior Court . . . . It would save a great deal of money, I think, of the State and it would make the men who retire at the age of seventy much more useful to the State than they are today." Conn. Constitutional Convention, Constitutional Committee Hearings, Resolutions and Rules (August 24, 1965) pp. 35–36.

[11] See footnote 6 of this opinion.

The legislative history of § 52-434a confirms that drafters of the statute intended to mandate that state referees exercise the authority of Superior Court judges in all civil matters and, further, that the repeal of statutes, such as § 8-132, that are inconsistent with § 52-434a and the constitutional amendment would not be necessary. Speaking in support of House Bill No. 3804, later enacted as § 52-434a, former Chief Justice Baldwin, then a judge trial referee, testified as follows at a public hearing before the judiciary committee: "The first section gives the additional powers of a state referee in a matter referred to him, to render a judgment, so that any attempt to attack the finding or any effort at an appeal, requires the same procedure as it requires from an appeal, in an appeal from a Judge of the Superior Court or Court of Common Pleas so that we avoid all this procedural rigamarole that we used to have and it also gives him the right to decide questions of law as well as to resolve issues of fact. . . . *The third section of the act is designed to deal with the problem of making it unnecessary to repeal or alter a large number of existing statutes.* As a matter of fact, I went through the matter myself and . . . if you had to go through all of these [statutes] to make these changes, it's a job that ought to be done by the revision commissioner rather than by the legislature because it's a highly, or at least the statute revision commissioner ought to make his recommendation about it because it's a highly complicated matter." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1967 Sess., pp. 485–86.

We further note that following the enactment of § 52-434a, our decisions involving appeals from the proceedings of judge trial referees conducting compensation reviews for property takings and condemnations pursuant to § 8-132 specifically have held that each judge trial referee acted with the full powers and authority

of a judge of the Superior Court.[12] See, e.g., *French* v. *Clinton*, 215 Conn. 197, 198–99, 575 A.2d 686 (1990); *Wronowski* v. *Redevelopment Agency*, 180 Conn. 579, 580, 430 A.2d 1284 (1980); *Gebrian* v. *Bristol Redevelopment Agency*, 171 Conn. 565, 567, 370 A.2d 1055 (1976); *Simmons* v. *State*, 160 Conn. 492, 496, 280 A.2d 351 (1971). Without explicitly stating that § 52-434a supersedes conflicting statutory procedures limiting the authority of judge trial referees in compensation reviews, this court has considered § 8-132 "reports" of judge trial referees as Superior Court judgments to be afforded the full weight and deference due a judgment of the Superior Court.

The interpretation of § 8-132 urged by the plaintiff is directly counter to the express provisions of both article fifth, § 6, of our state constitution and § 52-434a in that it would expand the scope of review of the referee's report by a Superior Court judge. We therefore reject that interpretation, and conclude, instead, that § 52-434a has superseded the procedural provisions of statutes that are inconsistent with § 52-434a, insofar as such statutes, like § 8-132, limit the authority of a judge trial referee to render judgment on his or her own findings. In enacting subsection (c) of § 52-434a, the legislature made clear its intention to vest judge trial referees with all the powers of the judges of the Superior Court in civil matters referred to them. Accordingly, we determine that although the trial court properly declined to conduct plenary review of the judge trial referee's report, the trial court should not have undertaken any

---

[12] Although § 52-434a references the Superior Court and the Court of Common Pleas, we refer to a judge trial referee as exercising the powers of the Superior Court, which reflects the merger of the Juvenile Court, the Court of Common Pleas and the Superior Court pursuant to the enactment of General Statutes § 51-164s. Pursuant to § 51-164s, effective July 1, 1978, all jurisdiction conferred upon the Court of Common Pleas and the Juvenile Court was transferred to the Superior Court. See, e.g., *State* v. *Kelley*, 206 Conn. 323, 328, 537 A.2d 483 (1988).

review of the report of the judge trial referee pursuant to § 8-132 because the referee had full authority to render judgment on his report.

## II

The plaintiff's first claim with regard to the merits of the referee's report is that the referee improperly considered the anticipated development of the area surrounding the defendant's property in determining its fair market value. The plaintiff argues that our ruling in *Commissioner of Transportation* v. *Towpath Associates*, 255 Conn. 529, 767 A.2d 1169 (2001), makes consideration of the value created by a condemnation impermissible. In response, the defendant asserts that there are few factual similarities between *Towpath Associates* and the present case, and that the rule of law articulated in *Towpath Associates* therefore is not applicable here. We agree with the defendant.

The following additional facts are necessary for our resolution of the plaintiff's claim. During the § 8-132 proceedings, the referee elicited testimony from both parties concerning the highest and best use of the defendant's property. The plaintiff's experts testified that the property's topography presented significant challenges to development and that the rearmost areas of the lot were effectively useless "excess" land. The plaintiff's experts further testified that the costs of development were prohibitive and the sloping topography would require the construction of "a great retaining wall [that] would not be economically worth it." Accordingly, the plaintiff argued that the defendant's property was unsuitable for retail development and that it had little value to anyone other than the plaintiff.

The defendant's experts testified that the parcel could be developed as a stand-alone retail strip mall. This could be achieved by developing the property as "a series of smaller commercial buildings rising up the

slope facing each other having two floors, terracing the property and providing access and egress to Saw Mill Road." The defendant's experts further testified that the foundation of the proposed development would "sufficiently act as a retaining wall without any additional support," which would obviate the need for an expensive retaining wall, and that retail establishments built on topographically similar properties in the area were "[h]ighly profitable."

The referee concluded that "[t]he highest and best use of the property would be for commercial and retail purposes," which was consistent with the testimony of the defendant's experts and counter to that of the plaintiff's experts. The referee's report makes reference to the retail developments mentioned by the defendant's experts and notes the property's location near a "planned major development."

"In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." (Citations omitted; internal quotation marks omitted.) *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 256 Conn. 813, 828, 776 A.2d 1068 (2001). It is well settled that "questions of the highest and best use of property . . . are . . . questions of fact for the trier." *Greene* v. *Burns*, 221 Conn. 736, 748, 607 A.2d 402 (1992). Accordingly, such conclusions are not to be disturbed on appeal unless clearly erroneous. *Commissioner of Transportation* v. *Towpath Associates*, supra, 255 Conn. 539; *Minicucci* v. *Commissioner of Transportation*, 211 Conn. 382, 388, 559 A.2d 216 (1989).

The facts of *Towpath Associates* are substantially different from those of the present case. In *Towpath Associates*, the commissioner of transportation challenged the trial court's valuation of two properties, each of which was unimproved with an abandoned bridge abutment located on either side of the Nepaug River in the town of Canton. The two properties were owned by two different defendants and the abutments and abandoned railroad track beds were condemned by the commissioner of transportation for the purpose of rerouting a road and replacing a bridge. *Commissioner of Transportation* v. *Towpath Associates*, supra, 255 Conn. 533. The trial court awarded damages to the defendant landowners based on the value of the abutments and track beds to the state and not based on their value in the ordinary market. The trial court reached this conclusion by determining that the highest and best use of the properties was as a bridge site. Id., 543.

The issue for us in *Towpath Associates* was "whether . . . an award may be made based on a parcel's highest and best use when that use requires an assemblage of separate lands." Id., 548. We concluded that "[t]he fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. . . . There must be a reasonable [probability] that the owner could use this tract together with the other [parcels for such] purposes or that another could acquire all lands or easements necessary for that use." (Internal quotation marks omitted.) Id. We determined that while it was possible that some party other than the state of Connecticut would be interested in building a bridge between the two abutments, it was not reasonably probable. Id., 551–52.

*Towpath Associates* is distinguishable from the present case. In the present case, the referee determined the highest and best use of the property with reference to its zoning, surrounding traffic, and *location*, which included surrounding uses and close proximity to the highways. Although the referee made reference in his report to the anticipated development of neighboring parcels, unlike in *Towpath Associates*, the report did not establish that such development was necessary to the referee's determination of the fair market value of the defendant's property. Accordingly, we conclude that the referee's reference to the anticipated development of surrounding properties was not improper.

## III

The plaintiff next claims that the referee improperly allowed the defendant's expert witness, Jeffrey Gordon, to testify on rebuttal as to the value of the defendant's property when (1) Gordon had not been disclosed previously as an expert as required by Practice Book § 13-4,[13] (2) the defendant had failed to provide the plaintiff with Gordon's appraisal report as required by Practice Book § 19-6,[14] and (3) Gordon was not qualified to give an expert opinion on the value of the property. In response, the defendant asserts that no disclosure of Gordon as an expert was necessary or even possible

[13] Practice Book § 13-4 (4) provides in relevant part: "In addition to and notwithstanding the provisions of subdivisions (1), (2) and (3) of this rule, any plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. . . ."

[14] Practice Book § 19-6 (b) provides in relevant part: "In making a reference in any eminent domain proceeding, the court shall fix a date not more than sixty days thereafter, unless for good cause shown a longer period is required, on which the parties shall exchange copies of their appraisal reports. . . ."

because Gordon was called as a rebuttal witness, and that an appraisal report was not necessary because Gordon was not an expert appraiser. The defendant further asserts that it was well within the referee's discretion to admit Gordon's testimony. We agree with the defendant.

The following facts are necessary to the resolution of the plaintiff's second claim. At the close of the plaintiff's case, the defendant indicated her intention to locate and call witnesses to rebut the testimony of the plaintiff's witnesses. Gordon was a rebuttal witness for the defendant who testified as to the feasibility of developing the property for retail and commercial use at a cost reasonable enough to make development probable despite the property's difficult topography and limited street frontage. The plaintiff did not object to Gordon's testimony until Gordon was asked to offer an opinion as to the value of comparable properties with which he was familiar but which had not been discussed by the plaintiff's expert appraisers in their analysis of fair market value. The referee determined that Gordon could testify as to "what [the defendant's] particular piece of property would accommodate from like and similar places," but that Gordon could not speculate as to the value of projects with which he was not involved personally.

With regard to the plaintiff's first two objections to Gordon's testimony, we note that it is well established that "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial . . . ." Practice Book § 60-5; see also *Texaco, Inc.* v. *Golart*, 206 Conn. 454, 460 n.6, 538 A.2d 1017 (1988); *LoRicco* v. *Pantani*, 67 Conn. App. 681, 685, 789 A.2d 514 (2002). The plaintiff did not object at trial to the defendant's failure to comply with the requirements of Practice Book §§ 13-4 and 19-6. These claims therefore were not preserved, and we need not consider them.

With regard to the plaintiff's claim that Gordon was not a qualified expert, it is well settled that "the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 392, 788 A.2d 1221 (2002). During the trial, Gordon testified that he held a bachelor's degree in landscape architecture and environmental design and also studied city planning. Gordon further testified that he was employed by an organization that was involved in land use planning, surveying, civil engineering and landscape architecture, and that he personally consulted with various agencies, developers, municipalities, and federal agencies on land use planning and determinations of the highest and best use of land. Gordon also testified that he had previous experience testifying in court as an expert land use planner. We conclude that the referee did not abuse his broad discretion in finding, on the basis of the evidence before him, that Gordon was an expert land use planner qualified to give an opinion as to the value of the defendant's property.

IV

The plaintiff next claims that the referee failed to consider the high cost of developing the property, given its unusual topography. In response, the defendant contends that her property could be developed at significantly lower costs than those estimated by the plaintiff's experts and that the referee's rejection of the plaintiff's experts' testimony was within his discretion. We agree with the defendant.

The following additional facts are necessary for resolution of this claim. At trial, the plaintiff offered testimony that the defendant's property could not be

developed without the potential developer incurring additional expenses of between $300,000 and $500,000. The plaintiff's experts contended, inter alia, that "a great retaining wall" would have to be built in part to protect the integrity of neighboring properties and that the other expenses associated with the parcel's development greatly reduced its fair market value. In response, the defendant's experts asserted that the property could be developed in a manner consistent with its unusual topography and without need for the extraordinary and costly measures described by the plaintiff's experts.

"Fair market value . . . involves a question of fact. . . . As with other questions of fact, unless the determination of the trial court is clearly erroneous, it must stand." (Citation omitted.) *Turgeon* v. *Turgeon*, 190 Conn. 269, 275–76, 460 A.2d 1260 (1983). It is well established that "[i]n an eminent domain proceeding, a trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . on the basis of all the circumstances bearing upon value." (Internal quotation marks omitted.) *Commissioner of Transportation* v. *Towpath Associates*, supra, 255 Conn. 541. It is also true that a referee "sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of [our courts] with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises." (Internal quotation marks omitted.) *Minicucci* v. *Commissioner of Transportation*, supra, 211 Conn. 388.

In the present case, the referee heard testimony from the plaintiff's and the defendant's experts and also made his own observation of the defendant's property. In his report to the trial court, the referee stated that "[t]he

valuation opinions of the appraisers are $1,256,000, condemnee and $300,000, condemnor. Both appraisers used comparable sales as a basis for their opinions. *This wide difference of opinions results from [the] condemnee's considerations attributed to this location as [a] viable site* . . . . After weighing all the evidence as to just compensation for the taking . . . the court finds the fair market value of this subject property to be $300,000 per acre." (Emphasis added.)

We conclude that the referee clearly considered the viability of the property as a development site in light of its topography. In finding a fair market value far closer to the opinion of the defendant's experts rather than to that of the plaintiff's experts, the referee credited the analysis of development costs and methods by the defendant's experts and rejected the plaintiff's expert analysis. The referee acted within his discretion in doing so.

V

The plaintiff next claims that in determining the parcel's highest and best use, the referee improperly made two findings concerning the potential use of the property as office space. First, the plaintiff claims the referee made inconsistent findings in determining that the property could be used as a strip mall, a major retail outlet and/or office space, and, second, he improperly found that the property could be used for an office building. We disagree.

The following additional facts are relevant to the resolution of this two part claim. The defendant's experts presented evidence that the parcel could support a retail strip mall and that there were two large, highly profitable retail shopping outlets in the area that were built on similarly shaped lots. The defendant's experts also testified that in addition to the retail aspects of the strip mall, the rear area of the property,

which had been identified as virtually worthless excess acreage by the plaintiff's experts, could be developed as office space. The plaintiff's experts testified that any stand-alone development of the property was not economically feasible.

It is well settled that "questions of the highest and best use of property and of the reasonable probability of a zone change are, however, questions of fact for the trier." *Greene* v. *Burns*, supra, 221 Conn. 748. Accordingly, such conclusions are not to be disturbed on appeal unless clearly erroneous. *Commissioner of Transportation* v. *Towpath Associates*, supra, 255 Conn. 539; *Minicucci* v. *Commissioner of Transportation*, supra, 211 Conn. 388.

The referee found at one point in his report that "[t]he highest and best use of [the] subject property is for retail development," and at another point, that "[t]he highest and best use of the property would be for commercial *and* retail purposes." (Emphasis added.) The defendant's experts consistently maintained that any retail development of the property also could easily include office space and the referee noted in his report that uses for the property permitted by its zoning were "expansive and numerous." While the referee did reference the defendant's proposal concerning a possible strip mall and did not refer specifically to "office" space, he noted that the defendant's experts proposed that a possible development of the parcel could include a series of commercial buildings. The referee's inclusion of this information was consistent with the expert testimony presented that retail development of the property could include commercial development as well.

"We have stated repeatedly that [t]he amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. . . . In determining

market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." (Citations omitted; internal quotation marks omitted.) *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, supra, 256 Conn. 828.

We conclude that the referee reasonably could have found that the highest and best use for the property included retail and commercial development, including possible use as office space. In doing so, the referee credited the defendant's experts, who testified that retail and commercial development were feasible. The plaintiff has not shown that the referee's findings were clearly erroneous.

## VI

The plaintiff next claims that the referee did not take into account the arguably lesser value of the rear portion of the property when calculating a per acre value for the parcel. The plaintiff argues that slopes on the rear portion of the defendant's property and the long distance from Saw Mill Road made the rear portion "excess acreage" with no fair market value whatsoever.

The following additional facts are necessary for the resolution of this claim. Experts for the plaintiff testified that the rearmost portion of the defendant's property "was non-developable or so called 'excess' land with no feasible worth." Experts for the defendant testified, to the contrary, that the entire parcel could be developed consistent with its highest and best use.

"[B]ecause each parcel of real property is unique, trial courts must be afforded substantial discretion in

choosing the most appropriate method of determining the value of a taken property." (Internal quotation marks omitted.) *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership,* supra, 256 Conn. 829; *D'Addario* v. *Commissioner of Transportation,* 180 Conn. 355, 365, 429 A.2d 890 (1980). Indeed, "[i]n determining fair market value, the trial court is free to select the method of valuation most appropriate to the case before it." *D'Addario* v. *Commissioner of Transportation,* supra, 366.

We previously have determined that the referee acted within his discretion in crediting the testimony of the defendant's experts with regard to the topographical challenges presented in developing the defendant's property. See part IV of this opinion. This claim is not significantly different and we therefore reject this claim for the same reasons.

## VII

The plaintiff next claims that the referee improperly failed to deduct the costs of demolition and removal of the dilapidated improvements on the property from its determination of its fair market value. The plaintiff devotes only two sentences in its brief to this claim and fails to cite any authority in support of its contention that the referee was obligated to deduct such costs in determining fair market value.

We are not obligated to consider issues that are not adequately briefed. See, e.g., *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities,* 232 Conn. 91, 115, 653 A.2d 782 (1995). We therefore decline to consider this claim.

## VIII

The plaintiff's final claim is that the referee's conclusion as to the property's value was not supported by the subordinate facts that he found. In support of this

claim, the plaintiff relies on evidence that it presented at trial that is reviewed in parts IV, V and VI of this opinion. As such, this claim is simply a catchall claim incorporating some of the plaintiff's previous claims. Because we have concluded that there is no merit to any of the prior claims, we determine that this final claim is likewise without merit.

The judgment is affirmed.

In this opinion KATZ and PALMER, Js., concurred.

ZARELLA, J., with whom SULLIVAN, C. J., joins, concurring. I agree with the majority's conclusion in this case but write separately to reaffirm my continuing belief in the plain meaning rule as expressed in my dissenting opinion in *State* v. *Courchesne*, 262 Conn. 537, 597, 618–19, 816 A.2d 562 (2003) (*Zarella, J.*, dissenting). Accordingly, I see no need for the majority, in part I of its opinion, to look farther than the text of General Statutes § 52-434a and article fifth, § 6, of the constitution of Connecticut, to reach its conclusion that judge trial referees may exercise the full powers of Superior Court judges in all civil matters referred to them notwithstanding the existence of any conflicting statutory provisions.