NORTHEAST CT. ECONOMIC ALLIANCE, INC., ET AL. *v.* ATC PARTNERSHIP ET AL.
(SC 17083)

Norcott, Palmer, Vertefeuille, Zarella and Langenbach, Js.

16

Argued September 24—officially released December 14, 2004

*Richard S. Cody*, with whom, were *Jon B. Chase* and *Lisa Silvestri*, for the appellants-appellees (plaintiffs).

*Richard P. Weinstein*, with whom was *Nathan A. Schatz*, for the appellee-appellant (named defendant).

*Opinion*

NORCOTT, J. In this latest chapter of the "protracted and contentious" dispute arising from the development of the Windham Mills property in Willimantic,[1] the plaintiffs, the town of Windham (town), and its implementing agency, Northeast Ct. Economic Alliance, Inc. (Northeast), appeal and the named defendant, ATC Partnership,[2] cross appeals from a judgment rendered after a

---

[1] The Windham Mills property has been a particularly fertile spawning ground for litigation before this court. See generally *ATC Partnership* v. *Windham*, 268 Conn. 463, 845 A.2d 389 (2004) (replevin action); see also *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 256 Conn. 813, 776 A.2d 1068 (2001) (initial property valuation dispute arising from computation of just compensation); *ATC Partnership* v. *Windham*, 251 Conn. 597, 741 A.2d 305 (1999) (rejecting federal or state constitutional tort claims arising from alleged abuse of eminent domain power), cert. denied, 530 U.S. 1214, 120 S. Ct. 2217, 147 L. Ed. 2d 249 (2000).

[2] The plaintiffs also named multiple other defendants in this action. The following defendants were named, but have failed to file appearances: the city of Willimantic; see footnote 4 of this opinion; the state of Connecticut; American Thread Company; Walter C. Goettlich; Laura C. Goettlich; Keith J. Nasin; Mark E. Nasin; Southern New England Telephone Company; Summit Hydropower; Willimantic Power Corporation; Eastern Connecticut Industrial Park Associates; Lloyd's Bank PlC; Farmington Valley Construction, Inc.; Tobacco Valley Sanitation Service Company; Willimantic Lumber and Coal Company; Willimantic Hydro Company, Inc.; and Baybank Boston, N.A.

court trial held pursuant to this court's remand order in *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 256 Conn. 813, 776 A.2d 1068 (2001) (*Northeast I*).[3] The trial court awarded the defendant damages of $1,752,365 plus interest and costs as compensation for condemnation of its real property, namely, the Windham Mills complex (property), located in the former city of Willimantic. The plaintiffs' primary claims in this appeal are that in determining the market value of the property, the trial court improperly considered: (1) the likelihood of the plaintiffs receiving $3 million in state economic development grant funds; and (2) the impact of state and federal environmental laws in determining who would bear financial responsibility for the environmental remediation of the property. The defendant cross appeals, arguing that the trial court improperly failed: (1) to incorporate in its compensation award the impact of the two separate funding sources, namely, the available state grant and the proceeds from potential environmental litigation against the American Thread Company (American Thread), the former owner and operator of the property; and (2) to give effect to the highest and best use of the property by ascribing a negative value to the Mill 4 parcel of the property, rather than severing that parcel. We affirm the judgment of the trial court.

The record and the trial court's thoughtful and comprehensive memoranda of decision reveal the following relevant facts and procedural history. The property consists of approximately forty acres of land with two dams

---

The remaining defendants, Connecticut Light and Power Company, Daiwa Bank, Ltd., and Michael Rosenberg, as assignee of Daiwa Bank, Ltd., have appeared, but are not involved in this appeal. Accordingly, all references herein to the defendant are only to ATC Partnership.

[3] The plaintiffs appealed and the defendant cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the proceedings to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

and approximately twenty-one industrial buildings located on both sides of the Willimantic River in the former city of Willimantic, in the town of Windham.[4] Most of the buildings are on parcels located on the north side of the river; the parcel containing Mill 4 is on the south side. A variety of companies, culminating with American Thread, used the property from 1854 until 1985 for the manufacture of textiles, including thread, yarn and string. By 1985, American Thread had moved all of its production operations out of Connecticut, and in 1986, it sold the property to Eastern Connecticut Industrial Park Associates (Eastern).[5] Thereafter, Eastern sold the property to the defendant.

Local authorities considered a number of redevelopment plans for the property, which has not been used for manufacturing activity since the early 1980s. Among the rejected proposals were plans to use it for housing or mixed use retail. Thereafter, in 1991, a portion of the property was designated as the Windham Heritage State Park in recognition of the historic and educational importance of the property; it was the first component of the state's heritage park system.

In 1993, a multidisciplinary team of architectural, economic and environmental consultants, with substantial input by the community and the defendant, prepared for the town a master action plan for the redevelopment

---

[4] We note briefly the political status of the area known as Willimantic. Willimantic formerly was an independent city; it, however, was consolidated with the town of Windham in December, 1982. See generally Windham Town Charter, c. IX. The geographic area that previously had been the city of Willimantic is now considered a service district in the town of Windham. Id., § 1. The service district provides police and fire protection within its boundaries, and levies taxes to finance those services. Id., § 2; see also *Windham First Taxing District* v. *Windham*, 208 Conn. 543, 545–46, 546 A.2d 226 (1988) (describing structure of Windham town government).

[5] The easternmost portion of the property, which consisted of undeveloped land on the southern side of the property adjacent to the Mill 4 parcel, was sold separately to unrelated parties in 1986.

of the park and the property (plan). The plan considered light industry with ancillary offices to be the highest and best use for the property. The plan divided the property into three large parcels, which consisted of: (1) a parcel of 10.4 acres between Main Street and the river, which contained the main complex of buildings; (2) a second parcel of approximately 22 acres located across the river to the south, which contained Mill 4;[6] and (3) a third parcel of approximately 5.1 vacant acres located to the east of the main parcel. The plan's environmental analysis noted that the property had environmental problems, including the presence of asbestos, lead paint, polychlorinated biphenyls (PCBs), and other chemical contaminants that would need to be abated prior to demolition or rehabilitation, but it did not consider these conditions "unusual." The plan, which was completed in December, 1993, estimated the total costs of a complete environmental investigation and remediation of the property to range from a low of $2.42 million to a high of $4.04 million.[7]

In the early 1990s, the parties had discussed the sale of the property from the defendant to the plaintiffs. Indeed, they jointly had engaged in efforts to obtain government funding for the redevelopment and rehabilitation of the property. These sale negotiations, however, were unsuccessful. Thereafter, in August, 1994, the plaintiffs filed with the trial court a statement of compensation in the amount of $1, followed by a certifi-

[6] The Mill 4 parcel is accessible via a historic one lane iron bridge across the Willimantic River. In addition to the river, Amtrak railroad tracks further separate it from the remainder of the property.

[7] The drafters of the plan consulted with department of environmental protection staff about the extent of the appropriate measures in calculating estimated costs for completing adequate surface and groundwater investigations, as well as containing or removing asbestos containing building materials, lead paint and PCBs in electrical equipment. The total figures herein are derived from the range of estimated costs listed in the plan for each necessary investigative or remedial measure.

cate of taking on September 9, 1994. The defendant then applied to the trial court for review of the statement of compensation pursuant to General Statutes § 8-132.[8]

At the first trial, the court, *Hon. Harry Hammer*, judge trial referee, considered the opinions of three appraisers, two called by the parties and one appointed by the court as an independent valuation expert, and rendered judgment awarding the defendant $1,675,000 as just compensation for the taking of the property. *Northeast I*, supra, 256 Conn. 825. In rendering its judgment, the trial court granted the defendant's motion in limine and excluded as a matter of law evidence of environmental contamination and remediation costs. Id., 815. The plaintiffs appealed from that judgment, and this court concluded that "evidence of environmental contamination and remediation costs may not be excluded, as a matter of law, from a condemnation proceeding"; id., 816–17; because that exclusion results in the misapplication of "the usual standard established for calculating just compensation, namely, fair market value."[9] Id., 827. Accordingly, this court reversed the

---

[8] General Statutes § 8-132 provides in relevant part: "(a) Any person claiming to be aggrieved by the statement of compensation filed by the redevelopment agency may, at any time within six months after the same has been filed, apply to the superior court for the judicial district in which such property is situated for a review of such statement of compensation so far as the same affects such applicant. . . .

"(c) If the court does not appoint a judge trial referee, the court, after giving at least ten days' notice to the parties interested of the time and place of hearing, shall hear the applicant and said redevelopment agency and take such testimony as it deems material, may view the subject property, and shall make a finding regarding the statement of compensation. *The findings of the court shall take into account any evidence relevant to the fair market value of the property, including evidence of environmental condition and required environmental remediation.* The court shall make a separate finding for remediation costs and the property owner shall be entitled to a set-off of such costs in any pending or subsequent action to recover remediation costs for the property. The findings of the court shall be conclusive upon such owner and the redevelopment agency. . . ." (Emphasis added.)

[9] The plaintiffs had made an offer of proof with respect to the widespread presence of asbestos and lead containing materials in the buildings on the

judgment of the trial court in *Northeast I* and remanded the matter for a new trial. Id., 843.

At trial after remand, the trial court, *McLachlan, J.*, heard testimony from Dean Amadon and Robert Nocera, appraisers for the plaintiffs and the defendant, respectively. It was undisputed that the highest and best use for the property was light industrial use with ancillary office support. The trial court utilized the comparable sales approach of comparing the property to the actual sales of similar land and structures, and making necessary adjustments for factors such as contamination in order to calculate the property's fair market value.[10] The court rejected the comparables proffered by Amadon, and concluded that Nocera's analysis was more persuasive. The court, relying heavily on the plan, concluded that there was 412,802 square feet of building space to be preserved on the property, with a "clean" value of $20 per square foot, for a gross value of $8,256,040. The court's value of $20 per square foot reflected a "conservative" 20 percent reduction of Nocera's estimate as to value, and did not include any allowance for costs offset by the recycling of materials from the demolished buildings.

After calculating the "clean" value of the property, the court then deducted the "substantial expenses" that

property, and the contamination of the soil and groundwater by PCBs, petroleum substances and other industrial pollutants. *Northeast I*, supra, 256 Conn. 821–23. The offer of proof represented that these contaminants had to be abated or removed in accordance with applicable codes before anything could be done with the property, including demolition, rehabilitation or occupancy of the structures thereon. Id. The offer of proof also included offers as to the estimated costs of such remediation. Id.

[10] Guided by the appraisers' testimony, the trial court also considered the applicability of the replacement cost and income capitalization approaches to property valuation, but concluded that they were inappropriate. For a more detailed discussion of the three major methods of property valuation, see *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 18–19, 807 A.2d 955 (2002).

would be incurred to clean and stabilize the property to arrive at a net fair market value of $1,752,365. In calculating these costs, the court made assumptions and findings of fact, including "[a] potential buyer would seek all sources of funds to reimburse or defray the environmental costs including investigation or remediation." Among these funding sources were: (1) $3 million approved for the project by the state bond commission on October 22, 1993—$60,000 of which already had been expended on environmental investigation prior to the 1994 taking; (2) American Thread's assumption of liability for the environmental cleanup to the extent required by Form III of the state department of environmental protection,[11] as well as the fact that its successor company was solvent and profitable; and (3) pursuant to Public Acts 1993, No. 93-382, the defendant "and any other for-profit partnership, proprietorship or corporation would be permitted to seek state financial assistance for the 'construction or rehabilitation of commercial, industrial and mixed use structures.' " Allowing deductions for legal and administrative costs, the trial court assumed specifically that 80 percent of the environmental remediation costs could be recouped from the $3 million grant and "from other potential sources, including American Thread." The trial court ultimately found that just compensation

---

[11] Pursuant to the Connecticut Transfer Act, General Statutes § 22a-134 et seq., a transferor of land must complete Form III when "a release has occurred which has not been cleaned up in a manner approved by the Commissioner of Environmental Protection or for any reason a negative declaration cannot be submitted." On Form III, the transferor certifies that "to the extent necessary to minimize or mitigate a threat to human health or the environment, I shall contain, remove, or otherwise mitigate the effects of any discharge, spillage, controlled loss, seepage, or filtration of hazardous waste at the site of . . . establishment in accordance with procedures and a time schedule approved by the Commissioner of Environmental Protection pursuant to an order, stipulated judgment, or consent agreement." The president of American Thread signed the applicable Form III on October 25, 1985.

for the defendant at the time of the taking in September, 1994, was $1,752,365, and that the defendant was entitled to an award of interest at the statutory rate of 10 percent; see General Statutes § 37-3c; and costs pursuant to § 8-133. Thereafter, costs were taxed by the court, *Quinn*, *J.*, and this appeal and cross appeal followed. Additional facts and procedural history will be set forth as necessary in the context of the parties' claims on appeal.

On appeal, the plaintiffs ask us to modify the judgment of the trial court. They claim that the trial court improperly: (1) "awarded" the defendant the $3 million in state grant funds; (2) concluded, without factual or legal foundation under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq., or General Statutes § 22a-452, that a prudent investor would consider the possible recovery of moneys from prior landowners responsible for the property's environmental defects, namely, American Thread; (3) violated this court's remand order in *Northeast I* by failing to adopt the unchallenged factual findings from the first trial; (4) set a 10 percent interest rate on the just compensation award; (5) awarded certain payments to various appraisers as costs pursuant to § 8-133; and (6) accepted nonexpert testimony on environmental remediation costs. With respect to the plaintiffs' appeal, we affirm the judgment of the trial court.

The defendant cross appeals, arguing that the trial court improperly failed to: (1) give full effect to the impact of the state grant and the possibility of recovery against American Thread's successor by not treating them separately and distinctly; and (2) give effect to the highest and best use of the property by ascribing a negative value to the Mill 4 parcel of the property, rather than treating it as separate surplus land with

zero value. With respect to the defendant's cross appeal, we affirm the judgment of the trial court.

Our review of the parties' specific contentions is guided by overarching and well established principles that our courts use to determine just compensation for a property owner whose land has been taken by eminent domain. They are set forth concisely in the majority opinion in *Northeast I*, supra, 256 Conn. 828–30: "[T]he question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken. . . .

"We have stated repeatedly that [t]he amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. . . . In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . . The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use. . . . The highest and best use concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate. . . . In determining its highest and best use, the trial [court] must consider whether there was a reasonable probability that the subject property would be put to that use in the reasonably near future, and what effect such a prospective use may have had on the property's market value at the time of the taking. . . .

"[B]ecause each parcel of real property is in some ways unique, trial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. . . . In condemnation hearings, the state referee sitting as a court [of] appeals . . . is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises." (Citations omitted; internal quotation marks omitted.)

I

WHETHER THE TRIAL COURT IMPROPERLY CONSIDERED THE AVAILABILITY OF STATE ECONOMIC DEVELOPMENT GRANT FUNDS IN VALUING THE PROPERTY

We first address the plaintiffs' claim that the trial court improperly awarded the defendant the state bond commission grant funds. The plaintiffs claim that the trial court improperly concluded that the grant was a "cache in the middle of the property that [had] three million dollars in it" for reimbursing the property owner. The plaintiffs argue that the grant money was: (1) not part of the condemned fee estate as a matter of law; (2) available only to governmental entities under Public Act 93-382; and (3) in any event speculative financing that should not have been used in determining the property's fair market value. The defendant argues in response that the plaintiffs have mischaracterized the ruling of the trial court because the trial court did not award it any money, but rather properly and equitably considered reasonably available state eco-

nomic development funds as a factor that necessarily increased the value of the property in the marketplace.[12]

The record reveals the following additional facts. In October, 1993, the state bond commission awarded to Northeast a total grant of $3 million for construction costs attendant to the Windham Mills Heritage Park project as outlined in the plan, including demolition, site improvements and structural construction. Statutory authority for the grant, which was funded by a bond issue, came pursuant to the Regional Economic Development Act, Public Act 93-382, § 27, which is codified at General Statutes § 32-325 et seq. The state and Northeast executed an assistance agreement to implement the grant in June, 1994.

At trial, Richard Mulready, a real estate appraiser with experience as a manager for municipalities including Enfield as well as Lewiston, Maine, testified for the defendant. Mulready testified that he had experience with the rehabilitation and redevelopment of old mills through his work in Enfield. Mulready testified that his legislative and administrative research disclosed that in the summer of 1994, state and federal funds were available for the environmental rehabilitation of old industrial sites such as the property in the present case. Testifying in his capacity as an expert real estate

---

[12] The plaintiffs characterize the trial court's ruling with respect to the grant as an award to the defendant. They rely on the trial court's remark during oral argument about the relevancy of the grant, referring to it as a "cache in the middle of the property that [had] three million dollars in it . . . ." The defendant, however, disagrees with this characterization of the ruling as an award; it argues that the trial court properly considered the existence of grant funds as a *relevant factor* in the equitable inquiry of calculating the property's value for just compensation purposes. Having reviewed both the transcript of that oral argument and the trial court's memorandum of decision, we disagree with the plaintiffs' characterization of the trial court's ruling as an award. The defendant's characterization of the trial court's ruling as one considering the availability of grant funds merely as a factor in calculating the property's value is more accurate, and we review the trial court's ruling accordingly.

appraiser, Mulready stated that he learned from Peter Simmons, a director at the department of economic and community development, that the property would have been eligible for consideration for the award of state environmental cleanup grants in September, 1994. Mulready testified further that the availability of such grants would be of interest to a real estate developer or purchaser.[13]

In considering the various costs attendant to the remediation and redevelopment of the property that would affect its value and, therefore, the amount of just compensation, the trial court also considered sources of reimbursement for those costs. The trial court also assumed that "[a] potential buyer would seek all sources of funds to reimburse or defray the environmental costs, including investigation or remediation." The grant was among these sources of reimbursement; indeed, the trial court noted that by September, 1994, approximately $200,000 of the grant money already had been spent toward investigation costs. The court further stated that pursuant to Public Act 93-382, "[the defendant] and any other for-profit partnership, proprietorship or corporation would be permitted to seek state financial assistance for the 'construction or rehabilitation of commercial, industrial and mixed use structures . . . .' " The court rejected the plaintiffs' argument that

---

[13] In their brief, the plaintiffs note that they objected to much of Mulready's testimony on hearsay and expert qualification grounds; the trial court overruled most of these objections. To the cryptic and fleeting extent that the plaintiffs claim that these evidentiary rulings were improper under the admissibility standards of *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), we decline to address them on this appeal because they are not briefed in accordance with the procedure set forth by Practice Book § 67-4 (d) (3). See, e.g., *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 447 n.20, 820 A.2d 258 (2003) (refusing to review evidentiary claim in case wherein "the defendants do not furnish any citation to the record, or to anywhere in the transcript, the trial court's ruling, or the defendants' claim grounds for admission of the evidence").

the availability of government reimbursement moneys should not "inure to the benefit of the owner," concluding that under Public Act 93-382 a "nongovernmental owner would be entitled to seek such reimbursement . . . ." The trial court concluded that 80 percent of the environmental remediation costs could have been recovered from a variety of sources that included the grant, as well as potential litigation against American Thread, and ultimately credited approximately $2.15 million toward the total rehabilitation costs for the property excluding building 1.[14]

Our analysis begins with the now axiomatic principle that in determining fair market value, "it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . . The determination of the damages to be paid requires the consideration of everything by which the value is legitimately affected . . . but considerations that may not reasonably be held to affect market value are excluded." (Citations omitted; internal quotation marks omitted.) *Andrews* v. *Cox*, 127 Conn. 455, 458, 17 A.2d 507 (1941); accord *West Haven* v. *Norback*, 263 Conn. 155, 168, 819 A.2d 235 (2003); *Northeast I*, supra, 256 Conn. 828. This court has applied this principle in a broadly inclusive manner, and we have noted that "trial courts enjoy substantial discretion in this regard." *Northeast I*, supra, 843 n.18. Inasmuch as this issue primarily presents a question of relevance, we review the trial court's consideration of the availability of public funds for abuse of discretion. Id.; see also *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 332, 838 A.2d 135 (2004)

---

[14] The trial court excluded building 1 on the property from its calculations because it would pose the highest rehabilitation costs, and a decision as to its fate did not need to be made at the time of purchase. The court then reduced its gross value of the property by $550,000, which was the "midpoint" of the financial burden that it assumed a developer would need to shoulder.

("Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . The trial court has wide discretion to determine the relevancy of evidence . . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." [Citation omitted; internal quotation marks omitted.]).

This court's jurisprudence reflects the deference that we afford our trial courts' determination of which factors are relevant in the valuation of a property. For example, in *Budney* v. *Ives*, 156 Conn. 83, 88, 239 A.2d 482 (1968), this court noted the realities of open market negotiations and held that when a zoning change "is reasonably probable and not merely a remote or speculative possibility, the probability may properly be considered in the determination of the fair value of property taken by eminent domain." This court did, however, caution that "[w]ishful thinking, optimistic conjecture, speculation, rumor and unfounded prognostications do not furnish a proper basis for a finding that a litigant has proved the reasonable probability of a future change in zone"; id., 89–90; but if "such a reasonable probability is proved, it is a proper fact to be considered in the determination of the fair value of property taken by condemnation proceedings." Id., 90. In *Budney*, this court held that testimony from the town planner and the chairperson of the planning and zoning commission about the actions that the commission would have taken to change the zoning of the condemnee's property from rural residential to one that would allow construction of a motel proved the "reasonable probability" of a zone change that would enhance the property's value. Id., 90–91.

More recently, in *Northeast I*, supra, 256 Conn. 833, we noted the general principle from *Andrews* and concluded that the trial court abused its discretion by

excluding, as a matter of law, evidence of the property's environmental contamination and the attendant remediation costs. We concluded that "evidence of environmental contamination and remediation costs is relevant to the valuation of real property taken by eminent domain and admissible in a condemnation proceeding to show the effect, if any, that those factors had on the fair market value of the property on the date of the taking." Id. We stated that "[i]t blinks at reality to say that a willing buyer would simply ignore the fact of contamination, and its attendant economic consequences, including specifically the cost of remediation, in deciding how much to pay for property" because of the various financial and legal consequences attendant to contaminated property. Id., 833–34. The majority opinion in *Northeast I,* however, did caution that it did not "say that the admissibility of the costs of remediation should necessarily result in, or should necessarily preclude, a dollar-for-dollar reduction in the market value of the property." Id., 835. It merely noted that such evidence was admissible, with the appropriate weight to be determined by the trier of fact. Id. Finally, the majority opinion in *Northeast I* emphasized that it did not "mean to *include* or *preclude* any other factor that a trial court appropriately may deem relevant in its determination of the amount, if any, that is to be awarded as a result of the condemnation of the property."[15] (Emphasis in original.) Id., 843 n.18.

[15] This statement was included in the majority opinion as a response to the separate concurring and dissenting opinions of Chief Justice McDonald and Judge Flynn. In his concurrence, Chief Justice McDonald stated that he would have included potential sources of reimbursement, including the liability of American Thread and the availability of federal and state funds, in determining the property's fair market value. *Northeast I,* supra, 256 Conn. 844–45. Indeed, Chief Justice McDonald relied on the defendant's statement at oral argument before this court that the costs had been "covered by federal and state funds." Id., 845 (*McDonald, C. J.,* concurring in part and dissenting in part). Judge Flynn dissented from the formula used by the majority. He would have compensated the condemnee for the right of recovery against American Thread lost because of the taking, as further

Whether the availability of public economic develop-
ment funds should be considered in calculating a prop-
erty's value for just compensation purposes presents
an issue of first impression in our state, and perhaps
nationally, as neither the parties' briefs nor the court's
independent research has disclosed sister state cases
addressing this question. In light of our case law
instructing us to be broadly inclusive when considering
the admissibility of factors that reasonably might influ-
ence a property's fair market value, we conclude that
the trial court properly considered the availability of
state economic development grant funds in calculating
the fair market value of the property.[16]

compounded by the prospect of being held jointly and severally liable as a
former landowner in an action brought by a former landowner under CER-
CLA. Id., 852–53 (*Flynn, J.*, dissenting). The majority opinion in *Northeast
I* emphatically did not, however, foreclose the subsequent inclusion of these
factors in determination of the property's value; it did, however, question
whether they existed in the record on that first appeal. Id., 843 n.18.

[16] The plaintiffs argue that the trial court misread the text of Public Act
93-382 and the grant when it concluded that the defendant or another "for-
profit partnership, proprietorship or corporation would be permitted to
seek financial assistance for 'construction or rehabilitation of commercial,
industrial and mixed use structures.' " They state correctly that only entities
that are "agenc[ies]" as defined under the Regional Economic Development
Act; Public Act 93-382, § 25 (2); may apply for grants pursuant to that act,
and that the defendant does not fit within the definition of "agency" set
forth therein. See General Statutes § 32-327 (2). They further note that
the grant documents reference expressly § 27 of the Regional Economic
Development Act. The plaintiffs argue that the trial court, therefore, should
not have considered the grant funds because they would not be available
to the ordinary real estate investor.

The defendant, however, argues that the relatively limited availability of
the specific financing that was actually awarded to the plaintiffs is irrelevant.
Moreover, it states that the trial court correctly considered the availability
of state economic development funds under other programs, particularly
Public Act 93-382, § 53, which was codified at General Statutes (Rev. to
1993) § 4-66c (d), and explicitly allowed private entities, both for and not-
for-profit, to apply for economic development grants from urban action
bonds that could be used for the "construction or rehabilitation of commer-
cial, industrial and mixed use structures . . . ."

We conclude that the language of Public Act 93-382, § 27, and its authoriza-
tion of the grant received by the plaintiffs did not preclude the trial court
from considering the availability of public economic development funds.
As the defendant points out correctly, the crucial question for the trial court

In the present case, Mulready's testimony about the available grants, as well as the fact that the state already had awarded funds to Northeast, established that it was reasonably probable that such funds were available.[17] It requires no great stretch of the imagination for us to conclude that a prospective real estate purchaser reasonably would consider the availability of such funds before purchasing a contaminated former industrial property located in an economically depressed region. Furthermore, it would be inequitable to consider the impact of environmental contamination on the property's value in accordance with our ruling in *Northeast I*, but exclude evidence of grant moneys that plausibly might mitigate the negative financial impact of the pollution in the eyes of a potential buyer. Thus, the availability of such moneys could only enhance the value of the property in the eyes of a reasonable prospective purchaser.[18] Accordingly, the trial court did not abuse

was whether funds were *available* to potential buyers at the time of the taking in September, 1994, not the funds that actually were awarded. Moreover, Mulready testified that he considered the effect of public-private partnerships in making economic development grant money available. Such funds clearly would be available under the Regional Economic Development Act to a private entity participating in a public-private partnership, so long as the regional economic development agency applied for the grant. See General Statutes § 32-327 (4) (" '[e]ligible project' means [A] a public or private improvement or acquisition which, in the sole judgment of the commissioner, will significantly enhance economic diversification, stability, growth or scientific knowledge in the region where the project is to be located"). Accordingly, the trial court acted well within its discretion by considering the availability of state grant funds under Public Act 93-382.

[17] The plaintiffs also argue that the grant funds are speculative financing that should not have been considered by the trial court in its valuation of the property. We disagree. This is a question of fact, and the trial court as trier of fact was free to credit Mulready's testimony about the availability of economic development funds for the property.

[18] The plaintiffs rely on *Mola Development Corp.* v. *Orange County Assessment Appeals Board*, 80 Cal. App. 4th 309, 95 Cal. Rptr. 2d 546 (2000), in support of their contention that expected future contributions toward the cleanup of contaminated properties bear no relevance to such a property's market value because "buyers are interested in actual money, not in the promise of funds or of reimbursement hopes." In that case, a tax assessment

its discretion by considering the availability of such grant funds in its calculation of the property's fair market value.

## II

## WHETHER THE TRIAL COURT IMPROPERLY CONSIDERED THE POSSIBILITY OF RE-COVERY FROM AMERICAN THREAD UNDER FEDERAL AND STATE ENVIRONMENTAL LAWS IN VALUING THE PROPERTY

The plaintiffs next contend that the trial court improperly considered the possibility of recovery from

appeal, a development company had purchased prime, but vacant real estate, for development into a mixed use commercial and residential area. Id., 312–13. The land was polluted with toxic waste from its former use as an industrial facility; the cleanup attempts had been unsuccessful. Id., 313. The developer then entered into an agreement with the two former landowners for contributions toward the remediation of the land. Id. The developer challenged the tax assessment, claiming that the costs of remediation should have been deducted from the market value used for the assessment. Id. The assessment appeals board reduced the assessment by the costs of remediation, but also added back into that reduction the amount that would be paid by the prior landowners. Id., 315. The trial court then ruled that the board's calculation was improper because the amount owed by former landowners should not have been added back. Id.

The tax assessment board appealed to the California Court of Appeals, which held that the "idea that prudent buyers might be willing to lessen the discount that they would demand on sale of the property in light of the fact that parties other than the seller might also have to contribute to cleanup costs simply does not accord with market reality, because of one unassailable fact: From the hypothetical buyer's point of view, the peculiar circumstances of the seller, such as its ability to recoup costs for which it is already liable, is irrelevant." Id., 325. The court further stated that "[i]t makes no difference to the buyer whether the seller pays the cost of cleanup, or whether the seller and some third parties pay them. The fact of life is that environmental laws will require those costs to be expended on the property . . . ." Id., 326. Accordingly, the California court concluded that the trial court properly determined that it was improper to add the cleanup contributions back into the market value.

*Mola Development Corp.* undoubtedly appears helpful to the plaintiffs' arguments in this appeal. We, however, find its reasoning fundamentally incompatible with the broadly inclusive approach to the admissibility of

other sources, including American Thread, in its calculation of the property's value. In their litany of contentions, they argue that the trial court improperly allocated liability for the contamination to American Thread and its corporate successor because the court lacked the requisite factual predicate for doing so. The plaintiffs also argue that the trial court improperly concluded that the potential rights to recovery under the environmental statutes were themselves property rights subject to the state and federal takings clauses. The plaintiffs also claim that the trial court should have refused to admit evidence of the solvency of American Thread's corporate successor because that evidence was irrelevant in the absence of a showing of liability. Finally, the plaintiffs contend that the trial court improperly failed to reduce the just compensation award and utilize the defendant's own liability under the environmental laws.

The defendant contends at the outset that the plaintiffs again mischaracterize the ruling of the trial court. Accordingly, we first review the memorandum of decision to determine the actual scope of the trial court's rulings. The court began with several baseline assumptions, starting with a "potential buyer would seek all sources of funds to reimburse or defray the environmental costs including investigation or remediation." After considering the availability and award of the grant funds; see part I of this opinion; the trial court noted that "American Thread had assumed liability for environmental cleanup to the extent required by the state [department of environmental protection] Form III and, in 1994, its successor company had sales of $3.4 billion and [earnings before interest, taxes, depreciation and

evidence relevant to valuation that we follow in this state. See *Northeast I*, supra, 256 Conn. 828; *Andrews* v. *Cox*, supra, 127 Conn. 458. The better approach under our well settled principles of property valuation is to admit such evidence, and permit the trier to assess its proper weight.

amortization] of $390 million and was paying a dividend." The court then "assumed that 80 percent of the remediation cost[s] could be recovered from the $3,000,000 grant and from other potential sources including American Thread." The trial court discounted the recovery by 20 percent because of administrative and legal fees that would be incurred during the process of seeking reimbursement.

The plaintiffs had argued to the trial court that it "should not consider at all the potential right to reimbursement which the owner [the defendant] had under CERCLA and . . . § 22a-452." The trial court rejected the argument, citing state and federal cases and holding that "[o]bviously, these are rights which run with the land. In accordance with the public policy of both the state and federal government, those responsible for environmental pollution should not be absolved of responsibility merely by divesting themselves of the polluted property. These rights are part of the inherent rights of ownership in the land which were extinguished along with title in the condemnation."

Having reviewed both the memorandum of decision and the plaintiffs' numerous claims on appeal, we conclude that the trial court's ruling presents two substantive questions for our review. The ruling was not as wide-ranging as the plaintiffs suggest, and in particular it does not allocate actual liability for the property's contamination in any way. Accordingly, we will confine our inquiry herein to: (1) the basic question of whether the trial court properly considered in its valuation of the property the possibility of recovering the remediation costs from the successor to American Thread; and (2) whether the trial court improperly concluded that the potential rights to recovery under the state and federal environmental statutes were themselves property rights subject to the state and federal takings clauses.

## A

In order to set the legal landscape for the plaintiffs' claims on appeal, we first engage in a brief review of the state and federal environmental statutory schemes providing for the potential recovery of remediation expenses. Under federal law, CERLCA permits the government or private parties to recover from potentially responsible parties reimbursement for remediation expenses that they have incurred in response to environmental threats. See 42 U.S.C. § 9607 (a); see also *Gussack Realty Co.* v. *Xerox Corp.*, 224 F.3d 85, 91 (2d Cir. 2000) ("CERCLA does not provide compensation to a private party for damages resulting from contamination. Instead, CERCLA permits a private party to be reimbursed for all or some of the costs already incurred in response to contamination."). Among the potentially responsible parties are the past or present "owners and operators" of covered facilities. See, e.g., *Commander Oil Corp.* v. *Barlo Equipment Corp.*, 215 F.3d 321, 326 (2d Cir.), cert. denied, 531 U.S. 979, 121 S. Ct. 427, 148 L. Ed. 2d 436 (2000). "Absent a showing that one of CERCLA's affirmative defenses applies, liability for owners and operators is strict." Id.; see also 42 U.S.C. § 9607 (b) (1) through (4) (providing affirmative defenses including "any combination" of "act of God," "act of war," or "act or omission of a third party" who lacks contractual or employee/agency relationship with defendant).

In addition to being strict, liability under CERCLA is also joint and several among all potentially responsible parties. *Bedford Affiliates* v. *Sills*, 156 F.3d 416, 424 (2d Cir. 1998). A landowner that is itself a potentially responsible party may not file an action against other potentially responsible parties pursuant to § 9607 (a); any recovery is limited to contribution pursuant to 42 U.S.C. § 9613 (f). Id. Section 9613 (f) provides: " 'Any person may seek contribution from any other person

who is liable or potentially liable under § 9607 (a) . . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.' . . . Thus, the statute envisions a two-part inquiry: First, the court must determine whether the defendant is 'liable' under [42 U.S.C. § 9607 (a)]. Second, the court must allocate response costs among liable parties in an equitable manner. . . . The party seeking contribution bears the burden of proof at both prongs of the court's inquiry." (Citations omitted.) *Goodrich Corp.* v. *Middlebury*, 311 F.3d 154, 168 (2d Cir. 2002), cert. denied, 539 U.S. 937, 123 S. Ct. 2577, 156 L. Ed. 2d 621 (2003).

Although a " '[p]erson' " under CERCLA is defined to include "corporations and other business organizations . . . CERCLA does not provide rules for [delineating] when corporations that are related to the responsible corporation should be held liable." *New York* v. *National Services Industries, Inc.*, 352 F.3d 682, 684 (2d Cir. 2003) (discussing 42 U.S.C. § 9601 [20] and [21]). The United States Court of Appeals for the Second Circuit has held that traditional common-law rules of successor liability apply when "the question is whether a corporation that purchased the assets of a company liable for environmental response costs under CERCLA should be held liable for those same costs as a successor corporation." Id. In *New York* v. *National Services Industries, Inc.*, supra, 685, the Second Circuit responded to the decision of the United States Supreme Court in *United States* v. *Bestfoods*, 524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998), by abandoning its CERCLA-specific "substantial continuity" test. It held that the liability of a successor corporation would depend on "the traditional common law rule . . . that a corporation acquiring the assets of another corporation only takes on its liabilities if any of the following apply: the successor expressly or impliedly agrees to assume

them; the transaction may be viewed as a de facto merger or consolidation; the successor is the mere continuation of the predecessor; or the transaction is fraudulent." (Internal quotation marks omitted.) *New York* v. *National Services Industries, Inc.*, supra, 685.

With respect to the relevant state laws, § 22a-452 (a) provides that persons or corporate entities who engage in environmental remediation measures "shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such" remediation if the contamination at issue "resulted from the negligence or other actions of such person, firm or corporation." Section 22a-452 provides for joint and several liability when there are multiple negligent parties. Section "22a-452 (a) broadly provides that any person, firm, corporation or municipality that contains, removes or otherwise mitigates the effects of contamination may seek reimbursement from any person, firm or corporation negligently responsible for such contamination. The clear purpose of this provision is to encourage parties to pay for remediation by providing them with an opportunity to recoup at least some of their remediation costs from others who are also found to be responsible for the contamination." *Knight* v. *F. L. Roberts & Co.*, 241 Conn. 466, 474–75, 696 A.2d 1249 (1997); id., 475–76 (holding that "the plaintiff [land seller] is entitled to reimbursement from the defendants under § 22a-452 (a) for their pro rata share of the costs of containing, removing or otherwise mitigating the contamination . . . if, as the plaintiff has alleged, the defendants are also negligently responsible for contaminating that property, and [the land purchaser] used the $400,000 it received from the plaintiff to remediate the contamination").

The Connecticut Transfer Act (Transfer Act), which is codified at General Statutes § 22a-134 et seq. is another state environmental statute relevant to our

inquiry. The Transfer Act subjects transferors of " 'establishments' " to reporting, investigation and remediation requirements that depend on the environmental condition of the property being transferred. See General Statutes § 22a-134a. The transferor makes the report on one of several forms, which are defined terms under the statute as Forms I, II, III and IV. See General Statutes § 22a-134 (10) through (13) (defining form contents). In the present case, American Thread filed Form III; see General Statutes § 22a-134 (12); when it sold the property to Eastern. That form was filed because "a release has occurred which has not been cleaned up in a manner approved by the Commissioner of Environmental Protection or for any other reason a negative declaration cannot be submitted." On Form III, the transferor certifies that "to the extent necessary to minimize or mitigate a threat to human health or the environment, I shall contain, remove, or otherwise mitigate the effects of any discharge, spillage, controlled loss, seepage, or filtration of hazardous waste at the site of . . . establishment in accordance with procedures and a time schedule approved by the Commissioner of Environmental Protection pursuant to an order, stipulated judgment, or consent agreement." The president of American Thread signed the applicable Form III on October 25, 1985, prior to the sale of the property. There is no indication that Eastern completed a Form III when it transferred the property to the defendant.

Failure to comply with the Transfer Act renders the transferor strictly liable to the transferee for remediation costs and other damages. See General Statutes § 22a-134b. "General Statutes §§ 22a-134 through 22a-134d were enacted to protect purchasers of property from being liable for the subsequent discovery of hazardous waste on the property by requiring the transferor of property to submit a formal declaration that the property is free of pollution." *Diamond* v. *Marcinek,*

27 Conn. App. 353, 358, 606 A.2d 1001 (1992), rev'd on other grounds, 226 Conn. 737, 629 A.2d 350 (1993).

B

The plaintiffs first argue that the trial court improperly considered the possibility of recovery from prior owners of the property responsible for the environmental conditions thereon. They argue that the trial court's ruling represents a fundamental misunderstanding of these laws, particularly the Transfer Act, and that the solvency of American Thread's successor corporation has nothing to do with liability.[19]

We begin by setting forth the appropriate standard of review. Whether the trial court properly considered the potential recovery of cleanup costs in calculating the property's fair market value presents an issue of relevance that we review for abuse of discretion. *Northeast I*, supra, 256 Conn. 843 n.18; see also *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, supra, 267 Conn. 332.

The trial court's consideration of the possibility of recovery of remediation costs, pursuant to the state and federal environmental laws must, of course, be viewed in the context of the broadly inclusive approach endorsed by this court in the context of property valua-

---

[19] The plaintiffs also argue that the admission of evidence about the potential recovery of remediation costs under federal and state environmental laws violates this court's holding in *Northeast I* that issues of fault are irrelevant in an eminent domain valuation proceeding. *Northeast I*, supra, 256 Conn. 836–39, citing 7A P. Nichols, Eminent Domain (3d Ed. Rev. 2000, P. Rohan & M. Reskin eds.) § 13B. We disagree. Just as "permitting the admission of evidence of environmental contamination and remediation costs in an eminent domain proceeding does not mean that in personam liability is being allocated in that proceeding"; *Northeast I*, supra, 838; consideration of the *potential* for the expedient recovery of those costs similarly does not mean the court is allocating liability. See also id., 839 ("[t]hus, the valuation trial no more allocates liability under the environmental statutes than it allocates third party liability in a situation where a parcel of property, prior to a taking, is damaged by a third party tortfeasor").

tion. See *West Haven* v. *Norback*, supra, 263 Conn. 168; *Northeast I*, supra, 256 Conn. 828; *Andrews* v. *Cox*, supra, 127 Conn. 458. We cannot exclude consideration of recovery of remediation costs pursuant to environmental laws as irrelevant as a matter of law, or conclude that the trial court abused its discretion by considering them. Put differently, we cannot conclude that a prospective purchaser absolutely would not consider the reasonable possibility of such recovery. See, e.g., *Andrews* v. *Cox*, supra, 458 ("[i]t is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land"). Inasmuch as the trial court "enjoy[s] substantial discretion" with respect to the factors that it considers in the valuation inquiry and the weight that it affords them, we are disinclined to disturb the trial court's ruling. See *Northeast I*, supra, 843 n.18.

Indeed, we note that our sister state, New York, has ruled similarly. In *Commerce Holding Corp.* v. *Board of Assessors*, 88 N.Y.2d 724, 673 N.E.2d 127, 649 N.Y.S.2d 932 (1996), a tax certiorari appeal, the New York Court of Appeals ruled that "environmental contamination can depress a parcel's true value . . . [and] must be considered in assessing real property tax"; id., 727; which, as a matter of state constitutional law, is calculated based on the property's fair market value. Id., 730. New York's highest court rejected the town's argument that the property's market value was unaffected by the presence of contamination because its owner was the subject of a consent order by which it agreed to pay the cleanup costs. Id. The court considered the impact of contamination on the property's value to be a separate question from the effect of the agreement to pay the cleanup costs, and held that "[w]hether a property owner's agreement [by consent order] to pay the cleanup costs would affect the property's value in a given case is a factual matter for the assessment board

. . . ." (Citation omitted.) Id., 730–31; but see *Mola Development Corp.* v. *Orange County Assessment Appeals Board*, 80 Cal. App. 4th 309, 325, 95 Cal. Rptr. 546 (2000) (holding that "idea that prudent buyers might be willing to lessen the discount that they would demand on sale of the property in light of the fact that parties other than the seller might also have to contribute to cleanup costs simply does not accord with market reality"); see also footnote 18 of this opinion.

The plaintiffs contend that the trial court improperly considered the possibility of recovery under the state and federal environmental statutes, noting that the "recovery of response costs is long, expensive, arduous and uncertain." They also contend that the requisite factual predicate for liability does not exist, noting that there was no evidence that the defendant had spent any money to rehabilitate the property. The plaintiffs also note that there are other legal issues with respect to establishing liability, including: (1) the applicable statutes of limitation; (2) a lack of proof of American Thread's culpability under § 22a-452 (a); (3) the defendant's own activities on the property; and (4) difficulties inherent in holding the successor corporation liable for the activities of American Thread under the traditional common-law rules governing that inquiry. Inasmuch as the allocation of liability under the state and federal environmental laws has no place in an eminent domain valuation action, we will not engage in a detailed analysis of the plaintiffs' legal arguments under the previously discussed state and federal statutes. Such analysis would yield nothing more than an advisory opinion on the merits of the parties' environmental causes of action. Our cursory review, however, reveals a variety of meritorious claims and defenses that would present legitimate issues for litigation or, preferably, settlement. We cannot, therefore, say that a reasonable possibility of at least some recovery pursuant to the

state and federal environmental laws does not exist, or that the trial court abused its discretion by considering that possibility in this case.[20]

### III

### WHETHER THE TRIAL COURT FAILED TO FOLLOW THIS COURT'S REMAND ORDER FROM *NORTHEAST I*

The plaintiffs next argue that the trial court improperly failed to follow this court's remand order from *Northeast I*. They claim that the trial court should have adopted the unchallenged factual findings as to the property's "clean value" that were the predicate for the first appeal, rather than conducting a completely new trial.

The plaintiffs' briefing of this claim is replete with violations of Practice Book § 67-4, and it fails to indicate that this issue was raised before the trial court. See, e.g., *River Bend Associates, Inc.* v. *Conservation &*

---

[20] The plaintiffs also contend that the trial court improperly concluded that the CERCLA and state law causes of action are "rights which run with the land." Even if we were to assume, without deciding, that this conclusion of law was improper, it is, in any event, harmless error. This conclusion appears in the context of the trial court's decision concluding that 80 percent of the environmental remediation costs could be recovered by a hypothetical *buyer*. The trial court's opinion does not in any way separately compensate the defendant for its loss of rights to state or federal causes of action.

We also note that the plaintiffs apparently claim that the trial court improperly ignored the value of the town's Form III. Specifically, they claim that by filing a Form III when it transferred the property to Northeast, the town assumed all responsibility with respect to the property's condition; accordingly, the property's value should be reduced. We decline to consider this claim on appeal. The plaintiffs' brief does not indicate that this issue was raised before the trial court. Moreover, this claim is inadequately briefed, with minimal citation to authority and no citation to the record, and is therefore procedurally not in compliance with Practice Book § 67-4. Accordingly, we decline to reach this issue. See, e.g., *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 82, 848 A.2d 395 (2004); *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 447 n.20, 820 A.2d 258 (2003).

*Inland Wetlands Commission,* 269 Conn. 57, 82, 848 A.2d 395 (2004). Nevertheless, the rescript in *Northeast I* only stated: "The judgment is reversed and the case is remanded to the trial court for a new trial." *Northeast I,* supra, 256 Conn. 843. The rescript did not contain any direction from this court limiting the issues to be tried. It is well settled that "a lower court is bound to follow the specific direction of an appellate court's mandate on remand." *Bailey* v. *State,* 65 Conn. App. 592, 598, 783 A.2d 491 (2001). Inasmuch as " '[a]n order restricting the issues [of a new trial] is the exception, not the rule' "; *Fazio* v. *Brown,* 209 Conn. 450, 455, 551 A.2d 1227 (1988), quoting *Niles* v. *Evitts,* 16 Conn. App. 696, 699–700, 548 A.2d 1352 (1988); we conclude that the trial court properly conducted an entirely new trial.

## IV

## WHETHER THE TRIAL COURT IMPROPERLY AWARDED CERTAIN COSTS

The plaintiffs' final claim in this appeal is that the trial court improperly awarded costs pursuant to § 8-133 for: (1) a real estate appraiser who testified as a fact witness; (2) an appraiser who testified to a business valuation of the successor corporation to American Thread; and (3) a deposition of one of the town's expert witnesses who did not testify at trial because his testimony was precluded on the defendant's motion.

The record reveals the following additional facts and procedural history. After the trial court rendered judgment, the defendant filed a bill of costs pursuant to § 8-133 to which the plaintiffs objected, challenging all of the claimed appraisers' expenses. The trial court, *Quinn, J.,* ruled on the bill of costs in a memorandum of decision dated October 7, 2003. The trial court granted the defendant's bill of costs in part and denied it in part.

Relying on its authority under this court's decision in *French* v. *Clinton*, 215 Conn. 197, 205, 575 A.2d 686 (1990), to decide what constituted a "reasonable amount" of fees, the trial court concluded that Nocera's appraisal costs were reasonable. With respect to Mulready, who testified about the availability of public funding for the rehabilitation of the property; see part I of this opinion; the trial court relied on the inclusive approach to valuation as stated in our opinion in *Northeast I*, supra, 256 Conn. 828, and concluded that appraisers' testimony need not "expressly be limited to expressions of a stated dollar value of the condemned property." The court found Mulready's claimed fees of $12,660 reasonable under the facts and circumstances of the case. The plaintiffs also objected to the claimed costs for Charles Coyne, an appraiser who testified about the solvency of American Thread's corporate successor. The trial court again relied on our holding in *Northeast I* and granted Coyne reasonable appraisal costs of $5762.50. The trial court also granted a request by the defendant for expenses of $1554.25, for Martin Brogie, an appraiser designated as an expert by the plaintiffs, but deposed by the defendant. Brogie did not testify at the trial. The trial court noted the policy of § 8-133 of encouraging condemning agencies to make awards of reasonable compensation, and concluded that proper trial preparation required the defendant to depose the plaintiffs' expert. The court noted that the policy of encouraging compensation that lies behind § 8-133 provides for costs that go beyond those limited costs authorized by General Statutes § 52-257. Finally, the trial court awarded to the defendant various deposition, marshal and copying costs.

Section 8-133 provides: "If, as the result of any review under the provisions of section 8-132, the applicant obtains an award from the court greater than the amount determined as compensation by the redevelop-

ment agency, *costs of court, including such appraisal fees as the court determines to be reasonable, shall be awarded to the applicant* and taxed against the redevelopment agency in addition to the amount fixed by the judgment." (Emphasis added.) We have held that with respect to costs awarded pursuant to § 8-133, "[t]he question of what constitutes a reasonable amount is an issue of fact for the trial court, and we will not overturn that finding unless it is clearly erroneous." *French* v. *Clinton,* supra, 215 Conn. 205.

The plaintiffs claim that the trial court improperly awarded fees to Coyne and Mulready because they did not appraise the property, and therefore their expenses were not "appraisal fees." The plaintiffs also claim that General Statutes § 52-260 (f) only permits a fee award to a real estate appraiser who has been summoned to give expert testimony at a trial. They also allege that the expense was not authorized pursuant to § 52-257 because title was not at issue in the proceeding. They contend that § 8-133 only provides for an award of appraisal "fees," not appraisal "expenses." Relying on our decision in *French* v. *Clinton,* supra, 215 Conn. 206, the defendant argues in response that the cost award was appropriate because the costs were for work that was " 'necessary for the court's determination of the value of the taken property.' " We agree with the defendant.

The plaintiffs do not contest the reasonableness of the *amount* of the trial court's costs award. Rather, they seem to argue that the statutory term "appraisal fees" does not encompass appraisal work pertaining to value impacting factors that lie beyond the property's terra firma. The plaintiffs' claim requires us to determine the breadth of the ambiguous statutory term "appraisal fees," a task that presents a question of statutory construction over which our review is plenary. See,

e.g., *Wasko* v. *Manella*, 269 Conn. 527, 534, 849 A.2d 777 (2004).

We begin our analysis with the statute's ambiguous language. Section 8-133 does not define the term "appraisal fees," and the only limitation imposed on such fees by the plain language of the statute is that the court determine them to be reasonable. Our review of the statute's legislative history reveals that it is silent as well.[21] Accordingly, we look for guidance in our prior cases addressing the scope of various costs statutes, including § 8-133.

"It is a settled principle of our common law that parties are required to bear their own litigation expenses, except as otherwise provided by statute." *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 715, 674 A.2d 845 (1996). A trial court may not tax a cost unless it is "clearly empower[ed]" to do so by the authorizing statute. Id., 716. For example, in *M. DeMatteo Construction Co.*, a tax assessment appeal, the trial court ruled that a city had overassessed a property. Id., 713. The trial court awarded the taxpayer costs; it declined, however, to award reimbursement of the fees for the real estate appraiser's report and testimony. Id., 713–14. This court affirmed that ruling, concluding that real estate appraisal costs could not be taxed because neither the text nor the legislative history of the tax appeal costs statute, General Statutes § 12-117a, mentioned appraisal costs. Id., 716. Taking note

[21] The legislature added the "appraisal fees" provision to § 8-133 in 1965. See Public Acts 1965, No. 285. Although the legislative history is silent, we note that in 1963, the Superior Court in *Drive-In & Shop, Inc.* v. *Redevelopment Agency*, 24 Conn. Sup. 390, 391, 191 A.2d 345 (1963), granted a municipality's objection to a $2100 appraisal fee because provisions of § 8-133 did not provide for appraisal costs at that time. The court limited the appraisal fee to $50 because "[t]he allowable fees of parties in civil actions are set out in § 52-257 of the General Statutes, and the only allowable costs for a real estate expert are 'not exceeding' $50, paid for an expert on the value of land in an action 'affecting the title to real estate.' " Id.

of, inter alia, § 8-133, the court further observed that "in circumstances in which the legislature has intended that the prevailing party shall recover appraisal fees, it has expressly so provided." Id. Finally, the court stated that the appraisal costs were not reimbursable under § 52-260 (f) because that statute, "[b]y its express terms . . . treats as taxable only those costs that arise from an expert's testimony at trial." Id., 717; id., 718 (distinguishing report made in preparation for trial testimony from testimony itself).[22]

This court has addressed § 8-133 on one prior occasion. In *French* v. *Clinton*, supra, 215 Conn. 205–206, an eminent domain valuation case, the trial court awarded to the plaintiffs $5000 pursuant to § 8-133 as a reasonable reimbursement of engineering fees incurred during the appraisal of their property. The trial court denied the plaintiffs' request for full reimbursement of the engineer's total bill of $48,933. Id., 205. On appeal, this court affirmed the trial court's decision, holding that its award of $5000 was not clearly erroneous because the trial court reasonably could "have found that the engineer's fees were based in part on work that was not necessary for the court's determination of

[22] In *Arnone* v. *Enfield*, 79 Conn. App. 501, 531–34, 831 A.2d 260, cert. denied, 266 Conn. 932, 837 A.2d 804 (2003), the Appellate Court recently considered the interplay of a statute authorizing the award of undefined "costs" and the general civil costs provisions of §§ 52-257 and 52-260. In *Arnone*, the trial court, acting pursuant to the undefined costs provisions of General Statutes §§ 31-51m and 31-51q, taxed against a municipal defendant the costs of the plaintiff's economist in a whistleblower case. Id., 530. The Appellate Court, relying primarily on our decision in *M. DeMatteo Construction Co.* v. *New London*, supra, 236 Conn. 715–18, reversed this order, holding that because neither § 31-51m nor § 31-51q "clearly empower[ed]" the award of the economist's fees; *Arnone* v. *Enfield*, supra, 532; the general costs provisions of §§ 52-257 and 52-260 controlled. Id., 533–34. Accordingly, neither the economist's trial preparation, or "nontestimonial costs," or in-court testimony were compensable costs because "[a]n economist is not a listed expert witness whose cost may be reimbursed under § 52-260 (f)." Id., 534.

the value of the taken property." Id., 206. This court also noted that the trial court could have found $48,933 "excessive . . . [because] the appraiser's total fee, which the court ordered reimbursed in full, was only $7700." Id.

In light of *French* v. *Clinton,* supra, 215 Conn. 206, wherein this court addressed the reasonableness of the award of *engineering* fees incurred in connection with the appraisal of a property taken by eminent domain, we conclude that appraisal costs awardable pursuant to § 8-133 are those costs reasonable and "necessary for the court's determination of the value of the taken property." Indeed, adopting an unduly restrictive construction of the statutory term "appraisal costs" would be inconsistent with the trial court's discretion to consider a broad variety of factors that reasonably might impact the value of real property; see parts I and II of this opinion; accordingly, we decline to reach the conclusion urged by the plaintiffs with respect to the testimony of the witnesses, Brogie, Coyne and Mulready. See, e.g., *Barrett* v. *Montesano,* 269 Conn. 787, 797, 849 A.2d 839 (2004) (" 'we interpret statutes to avoid bizarre or nonsensical results' "). There is no objection as to the reasonableness of the costs awarded; we, therefore, affirm the trial court's award of costs to the defendant.

V

THE PLAINTIFFS' OTHER CLAIMS

The plaintiffs have made numerous other claims in this appeal, specifically that the trial court improperly: (1) set, pursuant to General Statutes § 37-3c, a 10 percent interest rate on the just compensation award; and (2) excluded evidence of the actual costs of remediation, and the request of the department of environmental protection for further study of an ash landfill located on the property. We decline to review these claims

because the plaintiffs have not presented them appropriately to this court in accordance with Practice Book § 67-4.[23] See, e.g., *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004); *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 447 n.20, 820 A.2d 258 (2003).

## VI

## CROSS APPEAL: WHETHER THE TRIAL COURT IMPROPERLY FAILED TO CONSIDER SEPARATELY AND CUMULATIVELY THE EFFECT ON THE PROPERTY'S VALUE OF THE PUBLIC FUNDS AND THE POSSIBILITY OF RECOVERY UNDER THE ENVIRONMENTAL LAWS

The defendant cross appeals, arguing that the trial court's award improperly does not reflect the two separate possible sources of remediation cost reimbursement found by the trial court, namely, the public grant funds and the possibility of recovery under state and federal statutes. The defendant contends that these two sources should have been credited separately and cumulatively in the calculation of the property's value,

---

[23] More specifically, the briefing of the evidentiary claim lacks the verbatim statement of the relevant objections and the trial court's ruling thereon required pursuant to Practice Book § 67-4 (d) (3) for appeals of evidentiary rulings. See, e.g., *Barry* v. *Quality Steel Products, Inc.*, 263 Conn. 424, 447 n.20, 820 A.2d 258 (2003); see also *Aspiazu* v. *Orgera*, 205 Conn. 623, 636 n.5, 535 A.2d 338 (1987) ("[w]hen raising evidentiary issues on appeal, all briefs should identify clearly what evidence was excluded or admitted, where the trial counsel objected and preserved his rights and why there was error"). Inasmuch as the plaintiffs' briefing of the interest issue constitutes an abstract assertion completely devoid of citation to legal authority or the appropriate standard of review, we exercise our discretion to decline to review this claim as inadequately briefed. See, e.g., *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004) ("[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." [Internal quotation marks omitted.]).

and that $2,156,800 should be added to the property's value.

The record reveals the following additional facts and procedural history. In its initial memorandum of decision, the trial court concluded that "80 percent of the environmental remediation cost could be recovered from the $3,000,000 grant and from other potential sources including American Thread." The 20 percent deduction reflects administrative and legal fees incurred. Accordingly, the trial court reduced the environmental costs of $2,696,100 by 80 percent, or $2,156,800. Thereafter, ruling on the defendant's motion for reconsideration, the court actually noted that less grant funds had been spent than it had first concluded, and it increased the available reimbursement figure to $2,188,000. This adjustment, in turn, increased the net property value awarded to the defendant. Responding to the defendant's objection to the trial court's failure to treat the two sources of reimbursement separately, the court ruled orally that an action against American Thread's successor would be "plussing in terms of the value," but not a primary source of reimbursement because "real estate developers aren't in the business of buying lawsuits against foreign corporations," although the potential lawsuit would be a source of "some comfort" to a purchaser. In so concluding, the trial court had put itself "in the position of a potential buyer that wasn't enthusiastic about buying a lawsuit against a . . . subsidiary of an English company." It referred to the possibility of a lawsuit as more of an "insurance policy than a real first line contributor," and called it an available source to draw on should problems develop with other funding sources.

The defendant's claim on appeal essentially raises the issue of whether the trial court afforded proper weight to the evidence that it had presented concerning the availability of causes of action against American

Thread and the solvency of its successor. Our review of the defendant's claim is, therefore, quite limited. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses. . . . We afford great weight to the trial court's findings because of its function to weigh the evidence and determine credibility." (Citation omitted; internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 431–32, 849 A.2d 382 (2004); accord *Northeast I*, supra, 256 Conn. 835 ("[t]he weight, however, to be attributed to evidence of environmental contamination and remediation costs is to be determined by the trial court as the trier of fact"). Inasmuch as the determination of the proper weight to give the evidence of the potential civil action against the successor to American Thread lies squarely within the province of the trial court, we decline to disturb this ruling on appeal.

VII

CROSS APPEAL: WHETHER THE TRIAL COURT IMPROPERLY FAILED TO GIVE EFFECT TO THE HIGHEST AND BEST USE OF THE PROPERTY BY ASCRIBING A NEGATIVE VALUE TO THE MILL 4 PARCEL

In the defendant's second claim on its cross appeal, it contends that the trial court improperly failed to give effect to the property's highest and best use when it ascribed a negative net value to the Mill 4 parcel. The defendant argues that the evidence did not support the court's decision to include the remediation costs for that parcel in the total valuation.[24] Accordingly, the

[21] The defendant also argues that as a matter of law, the trial court should have considered the Mill 4 parcel to have a net value of $0, and removed

defendant asks this court to direct an increase in the judgment of $1,129,500, which is the amount by which the compensation award was reduced as a result of the negative valuation of the Mill 4 parcel. We disagree with the defendant, and we conclude that the trial court properly considered the impact of the Mill 4 parcel on the value of the entire property.

The record reveals the following additional facts. The plan did not call for any action to be taken with respect to the Mill 4 parcel other than "initial environmental cleanup . . . ." It noted complications affecting the parcel, namely, environmental issues, access limitations caused by the river and the old narrow bridge, and the lack of enterprise zone designation. The plan, therefore, stated that Mill 4 "should be treated as an independent and future development opportunity."[25] The trial court accepted the testimony of Amadon, the plaintiffs' appraiser, that the raw land of the Mill 4 parcel had fifteen usable acres valued at $25,000 per

it completely from the valuation process used for the rest of the property. The defendant argues that the condemnation should have been viewed in effect as a partial taking, and that including the costs of remediating a geographically separate property permits the condemnor to achieve the site with the "actual development potential for less than its fair market value." Our review of the record, including the defendant's motion for reconsideration filed with the trial court, indicates that the defendant confined its arguments to factual issues; the legal claim was not raised before the trial court. Accordingly, we decline to consider it here. See, e.g., *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 82.

[25] The plan also discussed the Mill 4 parcel complications in greater detail. It first noted a present lack of demand for the additional industrial space that would be located on the parcel, as well as the fact that the mill building would need to be demolished or substantially renovated. Adequate access would require construction of a new bridge over the river and the adjacent Amtrak railroad tracks at a cost of up to $3 million. The plan stated that demolition and cleanup could be accomplished most economically if "done in conjunction with similar activities at the rest of the site."

acre for a total of $375,000.[26] It also determined that parcel 4 required $612,000 worth of environmental work on the site and $267,500 for lead paint and asbestos containment.[27] The trial court then concluded that, after an offset for recyclable materials, the Mill 4 parcel would require $625,000 worth of demolition work. The total cost of the environmental and demolition work for the Mill 4 parcel was $1,504,500.

The trial court concluded that these environmental and demolition costs would have to be incurred because the Mill 4 parcel could not be "ignored" as it was. The trial court concluded from Nocera's testimony that " 'mothball[ing]' " the parcel in anticipation of future development opportunities was speculative, and that there was no evidence that a reasonable buyer or seller would find that course of action "acceptable." In ruling orally on the defendant's motion for reconsideration, the trial court noted the existence of a postinspection order from the town's building department to the defendant made in February, 1993, mandating the restoration or demolition of the building. The trial court "put [itself] in the position of the hypothetical buyer and seller," and determined that a hypothetical seller would not retain the useless Mill 4 and sell the rest of the property, and a hypothetical buyer would be concerned about the existence of Mill 4 because developing the rest of the property requires "cooperation from the city, and the city is not going to let you do anything until you in

[26] The trial court concluded that only fifteen of the more than twenty-one acres of land on the Mill 4 parcel were usable; it determined that the remainder had no value.

[27] The Mill 4 parcel environmental costs totaled $879,500. The trial court added this figure into the environmental costs for the remainder of the parcel; that gross environmental figure was then reduced by the $2,156,800 that the court deemed as available reimbursement funds. The remaining $539,300 of unreimbursed environmental expenses were then factored into the total property remediation cost that was applied to the gross value of $8,256,040.

some way address Mill 4." The trial court, therefore, considered the Mill 4 parcel costs as part of the $6,000,300 in environmental, stabilization and demolition costs that were applied to the property's gross value of $8,256,040 before further adjustments yielded the property's net fair market value.

The defendant argues that the highest and best use for the Mill 4 parcel would be to leave it untouched, and address the environmental problems at a later date prior to its development. Accordingly, the defendant argues that it should have been excluded from the trial court's valuation of the remainder of the property.

Determination of a property's highest and best use is a question of fact for the trier. Accordingly, we review the trial court's highest and best use determination for clear error. See, e.g., *West Haven* v. *Norback*, supra, 263 Conn. 168; *Greene* v. *Burns*, 221 Conn. 736, 748, 607 A.2d 402 (1992).

Having reviewed the trial court's decision with respect to the Mill 4 parcel, we cannot say that "there is no evidence in the record to support it . . . or . . . [that we have a] definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 23, 809 A.2d 955 (2002). Given the trial court's expansive discretion in determining a property's highest and best use and just compensation, it certainly was entitled to consider the effect on a hypothetical transaction of the existence of the Mill 4 parcel, the condemnation order and the attendant costs. See, e.g., *Northeast I*, supra, 256 Conn. 829–30. Indeed, the court also was entitled to credit the plan itself, which stated that demolition and cleanup could be accomplished most economically if "done in conjunction with similar activities at the rest of the site." See footnote 25 of this opinion. Inasmuch as the trial court

in a condemnation hearing is "more than just a trier of fact or an arbitrator of differing opinions of witnesses"; *Northeast I*, supra, 829; and it may rely on its "general knowledge" in addition to the record evidence; id., 830; we conclude that the court's ruling with respect to the Mill 4 parcel was not clearly erroneous.

The judgment is affirmed.

In this opinion the other justices concurred.